Good afternoon. This next matter involves consolidated cases 4-14-0043 and 4-14-0417 and 4-14-0418. Shannon Peters, plaintiff, versus Joyce Riggs, City of Quincy and Ameren, Illinois, defendants. There is also a countersuit, Joyce Riggs, counterplaintiff, and City of Quincy and Ameren, Illinois, as counter-defendants. What I'd like to do is just ask counsel to state your appearances and then also indicate how you anticipate splitting your time. Matthew Rondio for Shannon Peters. Thank you. Alright, very good. And then you're Mr. Palmer, correct? No, I am. Oh, you're Mr. Palmer. I'm sorry. But we have for Ameren and City of Quincy those that we'll be arguing, correct? Yes, sir. Alright, very good. Thank you. Then as to appellant's argument, Mr. Rondio, are you going to proceed first? Yes, sir. Alright, you may proceed. Good afternoon, your honors. My name is Matthew Rondio and I represent Shannon Peters, the appellant plaintiff in this matter. The issue presented for review is whether Shannon Peters was an intended and permitted user of Chestnut Street at the time she was hit by a motor vehicle. The 12 pedestrian sidewalks along Chestnut Street between 18th and 20th Street give a clear intent that the City of Quincy intended pedestrians such as Shannon Peters to use Chestnut Street. And because of this, we believe that she was an intended and permitted user and thus owed a duty of reasonable care by both defendants. The defendants disagreed and the trial court sided with the defendants and granted their motion to dismiss the plaintiff's complainant law. We believe that decision was in error. Turning to the law on section 2-section 103 immunity, the specific provision that's at issue here is the intended and permitted user exception to the Tort Immunity Act. There's a significant body of cases that interpret this provision of the Act, including a significant amount of cases that interpret specifically whether a pedestrian plaintiff crossing outside of a crosswalk mid-block is in fact an intended and permitted user of municipal property, primarily streets. That body of case law has developed a general rule that pedestrians crossing mid-block outside of a crosswalk are generally not intended and permitted users of a street or roadway because the primary purpose for a street or roadway is for vehicular traffic. Similarly, the primary purpose for a sidewalk is pedestrians. There are a couple of exceptions to that law, including an exception that was noted by the Fourth District Dishonorable Court in 2013. The first exception would be for a pedestrian who is accessing a legally parked vehicle. And there are a handful of cases that determine that because the municipality permitted parking along the roadway, that the pedestrian plaintiff was permitted and mandated to use the street to access the vehicle. Counsel, this was Chestnut Street in Quincy where the accident occurred? Yes, Your Honor. With regard to what you just said, does the record before us show whether or not there's parking permitted along Chestnut Street? It does, Your Honor. Between 18th and 20th Street, which is the border of Quincy University, towards the 20th Street side, which would be the west side, there are three dormitories. And in front of those dormitories, a majority of the curb is marked with a yellow no parking indication. Further east of that, there is street parking permissible. The significance of this exception that allows street parking is that, well, the specific exception may not be applicable here because Ms. Peters wasn't getting in or out of the vehicle. The implication here is that when the court recognizes that narrow exception, there is no marking on the surface of the street that would indicate pedestrians can use it. It's the nature of the use. And that's what we're arguing here. That because there were these 12 pedestrian sidewalks along Chestnut Street that went across the parkway and joined up with the street, that's a clear indication of the municipality's intent. And under the case law, it's clear. It's the municipality's intent that controls. And to determine intent, you look to the physical manifestations. Well, the only question about that, though, is it seems to me, suppose that the parking case, this is a pedestrian who's injured crossing the street. And why wouldn't a nice bright line be that when you're talking about a municipality in the street, that the municipality manifests its intention for intended and permitted users by putting in a crosswalk, as Quincy did, apparently at each end of Chestnut Street? At one end of Chestnut, there was a marked crosswalk. At the other end, there was what's commonly referred to as an unmarked crosswalk. But no other case, Your Honors, has interpreted this specific fact scenario where there are 12 pedestrian sidewalks across the parkway joining the street. You indicated, though, you didn't answer my question. You indicated the issue before us is a question of the municipality's intention for intended and permitted users. Why, given the need for clarity in this area, why shouldn't we hold? But absent a crosswalk, you're not an intended and permitted user if you try to cross in the middle of the street. Because there are sidewalks that invite, on an unrestricted basis, these pedestrians into the street 12 times in that block area. I don't understand why that follows. There's a sidewalk that ends at this sidewalk. There might be people dropped off or picked up by cars moving along the sidewalk. And there's parking at some areas of Chestnut Street. How does it follow that because sidewalks end at Chestnut Street, that anyone crossing anywhere within this three-block stretch, is you can cross anywhere you want and you're an intended and permitted user within the phrase as explained? Because when you look to the nature of the property, we have three dormitories on the south side of Chestnut Street. There are additional university buildings and a parking lot on the north side. It's a known busy area where students cross outside of crosswalks. And then they have the ability to do so because the municipality has installed and permitted, on an unrestricted basis, these 12 pedestrian sidewalks across the parkway. I'm not sure. I know you've now said this repeatedly and you argued it repeatedly in your brief, but I'm not sure how it necessarily follows because there's a sidewalk that ends, this perpendicular sidewalk, to the sidewalk that runs across Chestnut Street. Why that invites necessarily people to cross there? I mean, after all, if there were no sidewalks that ended perpendicularly with Chestnut Street, it would still be a busy sidewalk where people might be walking along. Isn't that true? It could be. I mean, if you've got all these dormitories and everything? I mean, it seems to me your argument is not much different than saying, hey, we've got three dormitories and a university there. People are going to cross in the middle of the street. They should know that. Therefore, they're intended and permitted users. Well, and that's why the sidewalks are there. There's a system of sidewalks, as you can see from the aerial photograph that's part of the appendix to our brief, that the sidewalks are funneled from the dormitory front doors out to the sidewalk that goes parallel to Chestnut Street. And then in front of the dormitories there are four sidewalks where we know students are going to cross the street to get to their cars or to get to sporting events on the other side that invite them into the street. They end in the street with the intention that pedestrians would cross the street. Well, how do we know that? I'm from Champaign-Urbana, and I see University of Illinois students jaywalking everywhere all the time. I don't think the university or the merchants in Campus Town intended that, but that's what they're doing. It seems to me that if you have dormitories, you might expect that that's what people are going to do, but that's not what an intended and permitted user means, is it? Well, that would be a different scenario if there weren't sidewalks that we have here. We have a clear manifestation from the physical conditions, these sidewalks leading into the street. If there weren't the sidewalks there, the fact that there were no sidewalks across the parkway... A clear manifestation of Quincy's intent that you should cross here and you're an intended and permitted user? Yes. But they forgot to put in a crosswalk? Well, there doesn't need... Isn't that essentially your argument? There doesn't need to be a crosswalk for pedestrians in the street to be intended and permitted users. There's no crosswalk, for the example and the exception we just talked about, where a person is going to or from their legally parked vehicle. There's no marking on the street. Well, we carved that out that you've got to be able to get to the driver's side of a vehicle. But we're talking about crossing the street. We're not talking about... Surely the city of Quincy should understand that if this is intended and permitted to be a spot where students or people are going to be crossing the street, put in a crosswalk. Isn't that what they should have done? That's your argument, isn't it? My argument is that by putting these sidewalks across the parkways in, they are allowing and encouraging pedestrians, such as my client, to walk across Chestnut Street at areas other than marked or unmarked crosswalks at each side of the intersections. And this is the only case, Your Honors, that there is a factual scenario where there is any physical manifestation on the property of a pedestrian crossing mid-block that would lead to the logical conclusion that they were encouraged and allowed to cross the street mid-block. None of the other cases, including the Supreme Court authority on this point, has a factually similar circumstance. And for that reason, we have a physical manifestation. We have the condition present, these sidewalks that lead into the street. The sheer number of them in such a limited area is also indicative that there is knowledge that people would be crossing in large amounts there and going across to the other university buildings. In your brief at the trial level for arguments, did you raise a voluntary undertaking theory of liability before the trial court? We raised a voluntary undertaking, I believe not with respect to the city, but with respect to... With regard to Ameren? Yes. Have you pursued that on appeal? We have not. Okay. I just wanted to make sure it wasn't an oversight on my part. No, we have not. Okay. For those reasons, Your Honors, we respectfully request that you reverse the trial court's order granting the defendant's motion to dismiss and allow the plaintiff to replete her case and continue on with her case. All right. Thank you, Mr. Rondillo. Mr. Elwood? Thank you. On behalf of Joyce Riggs, to the extent that the plaintiff's claims in this case are permitted to go forward, we would obviously ask that the claims of Riggs be allowed to go forward as well, particularly if the court finds it a question of fact and sends the case back for further determination about the intended permitted user status. But the perspective of the argument that we want to make today focuses on a little different aspect. Our position is asking this court whether or not the city and Ameren are subject to liability and tort for the purposes of contribution. And I think, to be frank, we have to start out and acknowledge to the court that we are aware of the wording of 3102A and its use of the word duty. And we're aware in a standard negligence case how the concept of duty is viewed as part of a prima facie case. But the distinction that we're asking this court to look at today in our case is, given the limiting nature of the Tort Immunity Act, Section 3-102 operates as an affirmative defense. Operates what? As an affirmative defense. And we have Illinois Supreme Court cases that date back many, many years that establish that as how you approach this act. And, in fact, when you read the Tort Immunity Act as a whole, you see that the entire concept of the act is one that's couched in immunity. And so the question is then for us, why is that important in this case? Why can't we simply look at this as maybe the court did in Vaughn or Huff and say, well, this is a part of the court case that needs to be pled by the plaintiff and it wasn't done and so therefore it's a part of a duty. The difference here really is the nature of this case arising out of the Tort Immunity Act with the affirmative defense that the court has said over and over. Mr. Elwood, I apologize in advance if I sound a little dense on this subject, but I want to make sure I understand what your argument is here. And I'm not sure I do. If this court were to conclude that no duty was owed to Shannon Peters by the city of Quincy, is it your argument that the city of Quincy is still liable to you, Ms. Riggs, who I guess ran into Ms. Peters, for contribution? The argument that we're making here is recognizing in a standard negligence case where we're not talking about a duty that's outlined or set forth in a particular statute, the duty question is a part of the essence of the case that must be pled. That's too hard and complicated a response from me. I think my question calls for a yes or no answer, Mr. Elwood. I'm not sure it can be answered in a yes or no given the nature of this case. Let me try again. Assuming we were to conclude that the city of Quincy owes no duty for the reasons the trial court mentioned to Shannon Peters, it's your position nonetheless that if any judgment were rendered against Joyce Riggs that the city of Quincy is still liable as a contributing tortfeasor for contribution? Yes, and I'll explain why. In the normal case without an act written as we have here, I think the answer would be different. But in this case, the vehicle that's been given to a party to raise this 3-102 is an affirmative defense, and that must be raised, and that's important for this reason. We spend a lot of time in our brief talking about the common law and how the Tort Immunity Act changed the common law, and that's important in this case for this reason. If I could run through this real quick. In the common law, municipality owed a duty of reasonable care, and that duty was not limited or fettered in any way by an intended user or permitted user distinction. That was brought into play by the Tort Immunity Act. It's our position, since the Tort Immunity Act is viewed as an affirmative defense, that a defendant in this situation must raise that in order to be able to say that to raise a defense that we have to have an intended or permitted user. Because what the Tort Immunity Act does with 3-102 is it attempts to codify the common law as it starts, and then it limits that duty by adding that user must be an intended permitted user. Let's assume for the moment this is an affirmative defense that can only be asserted under a 2619A claim, if I understand the distinction drawing. It can't be asserted under a 2615 claim saying that they failed to state a cause of action because we have no duty. And when you cite Immunity Act, that's a 2619A claim. How does it follow? That's where I'm having trouble figuring out. How does it follow that they are still liable in contribution to you if they are otherwise immune? Fair question. I think the difference here is the vehicle of the affirmative defense. And I really do think it comes down to the vehicle. Say again, the difference is what? The fact that we have 3-102, which raises the limitation of the duty in an affirmative defense. And this is why we think this is important. When you look at the cases that counsel has cited, which is the Brough case, the Fireman's Rule case, and you look at the Doyle case that we cited, we've got two distinct lines of thought here. In the Brough case, you've got a statute which adopts the common law and says there's no duty. So you've got no duty before the statute under the Fireman's Rule. And you've got no duty after the passage of the statute, which quantifies that. The difference here is in the Doyle case, you've got an employment situation with workers' compensation where that common law, an employer is liable in negligence. And the work comp thing creates an opportunity for the employer to come in after the fact and say, no, we're not liable because we have the affirmative defenses. Now, the difference there is in the Doyle case, the court said, yes, you're liable in tort until you raise the affirmative defense.  That's the analysis that we're trying to direct the court to. And the difference here from a normal case that you see where there's a common law duty of negligence, and you've got to lay out all your elements, is that in this case with the Tort Immunity Act, 3-102 embodies this language within a statute. And it says here's your duty, and it's limited by these factors, which are the intended permitted users. And so our position is because of the way that this is structured, we've got a different situation here than we do in a standard run-of-the-mill case. And because you have to raise that limitation to the duty by an affirmative defense, then that puts us into this Doyle versus Rhoades scenario rather than a Rhoades scenario. Well, it's an interesting and smart tact to take here because if we find that Ms. Peters was not an intended and permitted user for 3-102, and if we say that 3-102 sets forth the duty, then you cannot argue the language in the Contribution Act being subject to liability of tort. So you have to convince us that 3-102 does not set forth duty, but instead is an immunity statute. But how do you get around the Supreme Court in Washington versus City of Chicago indicated 3-102A does not impose any new duties on municipalities. Instead, it just simply indicated 3-102 codified a municipality's duty. There's two points to that. I don't think 3-102 imposes any additional duties. I think what it does is it limits the duties that were previously recognized by the common law, and it limits those by restricting the obligation to intended and permitted users. And we pointed to the body of case law prior to the Tort Immunity Act, and there's no recognition of an intended and permitted user distinction. Why would there be language of intended and permitted users in pre-1965 law when that wasn't relevant? But that wasn't the law, and that's our point. Well, are you saying that there was no case law indicating that there was no duty if an individual was not meant to be in that location? Right. And if you look at the Keith case that we cited from 1885, I think it was, in the Keith case they tried to do that by way of an instruction. They had a child who was using a hoop of some sort on a sidewalk, and there was an ordinance that prohibited that type of activity. And the question was whether or not you could instruct the jury if this child was using this sidewalk in an unintended, unpermitted manner. And the Supreme Court said, no, we're not going to allow that type of instruction to be used. So that was an opportunity for the court to place a limitation on what the scope of this general duty of reasonable care was. So you haven't answered Justice Harris's question. In the Washington case, the Supreme Court explicitly said, did not impose any new duties and municipalities, and it instead, Mr. Keith, codifies a municipality's duty of common law. I do not believe it codifies it in a 100% manner. I absolutely do not. So we'll have to explain how the Supreme Court misspoke when they wrote that? I don't know if this issue has been squarely presented to the court in that context. Well, here it seems to be squarely presented when the Supreme Court said, it codifies a municipality's duty of common law. How can those words mean anything other than this business of the intended, permitted user that's spoken to in 3.102? That's always been the law. Isn't that what codifies means? If I may finish. Yes, that's what that does mean. But when we look at the actual history, and when we look at the case law that came before the enactment of the Tort Immunity Act, that language is not there. So while it may attempt to codify the general duty, the limitations that the Tort Immunity Act places are not there. They're just not there. Thank you. Thank you. Ms. Jones? Good afternoon, Your Honors. If I may start with the contribution issue, I believe that may have a little bit more meat on its bones. I would like to address Mr. Rundio's position that the 12 landings constitute these de facto crosswalks, but, frankly, we don't believe there's a whole lot of substance there. It either does or it doesn't. So with that said, I'll start with the contribution issue. To be subject to contribution, the city would have to be a joint tort visa, and Your Honors have stated that here today. Riggs's position is based on several faulty premises, one of them being that the common law did not limit the duties to intended and permitted users. In fact, when you look at the body of case law that has been cited by Ms. Riggs, those were all clearly intended and permitted users. So, again, why would the court have addressed that issue? They're talking about people who were pedestrians using the sidewalk and people who were drivers using the street. Let me ask this question because I might embarrass myself by my ignorance, but it seems to me that the premise of Mr. Elwood's argument, I want to see if you agree with him, is if the city is arguing immunity under the statute and only immunity under the statute, and if the city would have a duty but for the statute to the plaintiff in this case, then the city is liable as a joint tort visa for a contribution, even though the city is not liable directly to the plaintiff because of 3102. That seems to be his argument. Is he correct in that? He may be, but that's not the question we have before us. Even before I get to the question before us, why is that the case? Is that how the Contribution Act is written, so that the city, which is otherwise immune directly, is still liable to a joint tort visa under the Contribution Act? I will jump ahead in my argument then because I intended to address that issue because even assuming for the sake of argument that Section 3102 is an affirmative defense, there's a whole body of case law that says the tort immunity still would trump the Contribution Act. It doesn't really matter what we call it. The public policy behind the Tort Immunity Act is to protect the taxpayers from having a duty at large. Would this require some kind of construction of the Contribution Act to reach that result? I don't believe so. It says subject to liability. I'm a little surprised by the whole argument in the context. Is this really the first case in the whole state of Illinois in which the municipality or the party who claims immunity under the Tort Immunity Act, the issue is are you still subject to contribution as a joint tort visa? We're going to be resolving that? We're the first? It is the first as far as Section 3-102 is involved. That's where the distinction is because the text of Section 3-102 says there is a duty. It uses the term duty. The other immunity provisions following that all speak about whether the municipality is liable or immune. So in this context it hasn't been addressed. How about in the other, if there were some other immunity being asserted here other than 3-102, what's been the holding of that? Now language is different, but still the holding is that if the party asserting immunity under other provisions of the Tort Immunity Act is successful, are they then also immune under the Contribution Act? The holding has been that the Tort Immunity Act trumps the Contribution Act. And there's a whole laundry list of cases. But for 3-102 this hasn't been definitively resolved? Correct. We're doing the first. Counsel, can I ask a question relating to Ms. Peter's claim? Because I want to address here the sidewalk issue. And I'm going to pose a hypothetical that isn't this case. But it gets to this issue that Mr. Rundio was talking about, and that being the physical manifestation indicating the city's intent. So here, let's just assume on a block you have a sports facility on one side of the street, and on the opposite side of the street you have a parking lot. And you have squarely in the middle of the block, the center of the block, a sidewalk spur leading from the parking lot to the curb line. And then on the exact opposite side of the street, parallel in line, another sidewalk leading from the opposite curb to the sports facility. Now, we're talking about sidewalks here. We're not talking about street cutouts. We're not talking about parked cars or anything. If that is an unmarked crosswalk, would that be a physical manifestation? The fact that there are sidewalks in line with each other, from what would appear to be an obvious parking lot serving a sports facility, would that be a physical manifestation indicating there is a crosswalk between those two sidewalks? Sure. I don't believe so. And the reason I don't think so is we've got a whole body of case law that says when you have a mid-block crossing, you need markings. And sidewalks are not markings. And you look to the state Illinois Vehicle Code, and you look to the federal regulations on what types of markings mean what, and those tell us that. Those tell us what are markings and what constitutes a crosswalk. Who built the midpoint sidewalks? The landings? I would refer to them. University? I believe it was the city. As a matter of fact, they're all over the city. If you drive along Quincy, you could go to Google Earth. These landings are dotted. There's hundreds, maybe thousands of them. What are you calling them? Landings? Yeah. That's my unofficial description of them. Of sidewalks? The concrete areas between the parkway and the sidewalk I would refer to as a landing. I don't know if it would matter, but following up on Justice Harris' question, we've heard the arguments about how there are these 12 sidewalks that end on the sidewalk that runs across next to Chestnut Street. Where Ms. Peters was struck, again, I don't know that it would matter, but was she walking in a line from one of these sidewalks where it ended, where she would be then arguably, it's like an implicit crosswalk, where she had ended coming from the sidewalk that ended. So you're asking if she left from one of these landings? Yes. Unfortunately, we don't know that. Ms. Peters herself was the only person who would know that, and I understand she wouldn't be competent to say that. Well, Ms. Riggs would know where this occurred. She has a general idea, and in her deposition she did give a placement. We believe the city has interviewed the police officers who responded to the scene and taken measurements. So there may have been a landing nearby, but we can't pinpoint precisely where it was. Are there any further questions? All right. Thank you. Thank you. And Mr. Wilson. May it please the Court, Counsel. On behalf of Emrin, Illinois, I want to highlight a couple of points. First, Emrin in this case filed a 2-615 motion to dismiss, so there's really no question about Emrin trying to raise some kind of an affirmative defense. Emrin's dismissal was based on the conclusion that Emrin did not owe a duty to the plaintiff in this case. When we begin the arguments in the circuit court, what we were looking at was the Park Ridge case from the Supreme Court of Illinois, which had a very similar circumstance where you had an individual crossing the street mid-block who was struck and finding there was no duty on behalf of the city and also on behalf of the utility company in that case. And there was a comment made by the Supreme Court that the utilities company, its duty could be no greater than that of the city. And there wasn't a lot of analysis in that case or in the appellate court decision in Dunnett, which followed from the first district. But I think logically, if the city, which designs the streets and chooses how it's going to be used and where pedestrians are going to be crossing and where they're not supposed to be crossing and decides what lighting they want from the contractor, Emrin in this case, doesn't have a duty, why would the contractor have a duty? And necessarily in that you draw a distinction between a duty to do what? Here it's the duty you're talking about to eliminate, or excuse me, not eliminate, illuminate the street versus a duty to keep a piece of equipment from falling on someone. Is that right? Correct. There's no argument or issue in this case that there was any physical property of Emrin that injured Ms. Peters. Let's say that there was. Let's say that instead of Ms. Peters being hit by a car, she was hit by an Emrin streetlight owned by Emrin. And she's crossing mid-block, but that streetlight is right over her in mid-block and it hits her. You wouldn't be able to argue that 3102 means she wasn't an intended and permitted user. Therefore your Emrin's liability is no greater than the municipality's, correct? Yeah, I don't believe we'd be making the argument in that case, because in this case really Emrin and the plaintiff pled this, and Emrin never disagreed, that Emrin is certainly not a local public entity. So the analysis under 3-102 is really a derivative analysis. It's where it begins with the Park Ridge case. But then the plaintiff said to Judge Ortbaugh, well I'd like to try to plead a common law duty against Emrin, so I think they have some common law duty here. The issue then was, we'll go through the standard four steps of a common law duty analysis under either the Bruns case with the recent Supreme Court decision, or this Court's Burkett decision against Emrin, which I argued, which both dealt with the issue of utility companies, in the case of Burkett, common law duty, that is foreseeability and likelihood of injury and all of that. And what the Court has said is that when the condition is obvious, and the Supreme Court defines it as what a reasonable person exercising ordinary perception would appreciate the risk of, then it's not foreseeable, because you expect somebody is going to exercise ordinary care to avoid that risk. And the likelihood of injury is also not high, because again you expect that the individual is going to avoid that risk. But counsel, let me interrupt you if I could. Are you saying that it's still necessary to proceed with a traditional duty analysis when the claimed duty is one to provide illumination? I'm saying that in this case, the plaintiff added a second count to their complaint, suggesting that they could establish a traditional duty. Well, whether or not they plead that or not, the two cases that you've referred to say that the utility's duty is no greater than the municipality's. Where it comes to the provision of lighting, are you saying that we still have to look at duty under a traditional duty analysis, or are you commenting on this as a belt and suspenders sort of argument? Well, I think it's certainly the latter, because the cases in Park Ridge and Dunnett I think answer the question from Ameren's point of view. However, given that the plaintiff has suggested that you could set those aside and try to plead a traditional duty analysis, then under the cases from Bruns and Burkett, there's certainly not a traditional duty, even if you went beyond what the Park Ridge decision found. So under either analysis in this case, there was no duty on the part of Ameren to a pedestrian crossing the street mid-block, as there was in this case. And the last point I will make, because it's addressed by the plaintiff in their brief, is the plaintiff makes a suggestion that, well, Ameren had a contractual obligation under its tariff with the city to replace street lights that are out once we're given notice. The plaintiff likes the first half of that contract, if you will, but they ignore the fact that the contractual risk, if you will, that Ameren undertook for not meeting that obligation was we have to abate the electricity charge for that particular street light. So I don't think they can cherry-pick this is the half of the bargain we like to say it's a minimal burden on Ameren, but at the same time we can ignore what the contractually allocated risk is to try to create some duty. Thank you, Your Honors. Thank you. Mr. Rodney? I'd just like to address some of the points that came up here. The first point is that the city seems to argue that the only way Ms. Peters can be an intended user of the street is if there's a crosswalk. No case holds that. The cases that talk about a person getting in and out of a car, there's no painted line on the street. The alley cases, Cavallis and Blutstein out of Evanston, there's no marking on the sidewalk. So I don't believe that's a proper premise for evaluating this particular case because we have a physical manifestation. And the fact that there are 12 of these is not a mid-block crosswalk. This is an area where the city made the decision to install these sidewalks across the parkway to allow people to go into the street. If they didn't want people to go into the street, as came up earlier, they could have put a fence up at the end. They could have put some markings on the pavement saying, don't enter street. They didn't do any of that. This is an open invitation for pedestrians to go into the street in 12 places. The issue came up also about maintaining the streetlights under the traditional duty analysis. Whether it's a motorist or a pedestrian, the defendants have a duty and obligation to maintain the streetlights. And because there are motorists, in some of the cases, the property should be maintained for intended users, which clearly motorists are of the street. They were under an obligation to maintain the street and the streetlights anyway. So imposing a duty to do it for pedestrians doesn't increase the magnitude of the burden. It doesn't cause them any additional expense because they were obligated to do it for intended users of the street, like Ms. Riggs. When we look at all of the facts and the physical manifestations in this case, Willogia didn't have it. Dunnit didn't have it. No other case that interprets the issue of whether a pedestrian crossing midblock outside of a crosswalk was an intended and permitted user. Was there even an allegation that any part of the municipality's property gave an intent or the indicia of intent that people be in the street? And we have that here. That's why this case is different than the other cases. And that's why the trial court erred in granting the defendant's motion to dismiss. Thank you. Okay. Thank you, counsel. This case is going to be taken under advisement and a written decision will issue. The court is in recess.